# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

ORIGINAL

2015 NOV 17  PM 2: 17

DEPUTY CLERK

BENNIE P. WASHINGTON
Plaintiff

v.

CONCENTRA CLINIC
Defendant

3-15CV-3698N

Civil Action No.

## COMPLAINT

I WENT IN CONCENTRA CLINIC IN THE PIANO OFFICE FOR A REGULARLY DOT PHYCIAL AND DOCTOR THAT SAW ME ON THAT DAY LIED TO ME ABOUT THE DOT TEST HAVE CHANGED BY ON THE PAPERWORK SHE SAID SHE DIDN'T CHECK FOR THOSE THINGS THAT SHE CHECK ME FOR SHE TOUCH ME CLOSE TO MY PRIVATE PARTS AND SHE BENT OVER SO SHE COULD SEE SHE ASKED ME TO PULL DOWN MY UNDER WEAR THATS NOT A PART OF DOT TEST. I HAD TWO ATTORNEYS THAT DIDN'T DO ANYTHING ON MY CASES.

\* Attach additional pages as needed.

| | |
|---|---|
| Date | 11-17-15 |
| Signature | Bennie P. Washington |
| Print Name | BENNIE P. WASHINGTON |
| Address | 2448 Laughlin Dr. # 233 |
| City, State, Zip | DALLAS TX 75228 |
| Telephone | (469) 316-5117 |

Concentra Clinic Corporate Office
5080 Spectrum Dr. #1200
W. Addison TX 75001
(972) 364-8000
www.Concentra.com

Concentra Clinic Attorney
1200 Bank of America Plaza
901 Main St.
Dallas TX 75202-3758 - USA
(214) 698-8814 - FAX (214) 698-1101
Wilson Elser - Maskowitz Edelman & Dicker U.P.

Lawyer Linda Stimmel

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 3 of 52   PageID 7
In Re: Bennie Washington
Deposition of: Bennie Washington

7/25/2014

1

1  IN RE:  BENNIE WASHINGTON

2

3  DATE:   FRIDAY, JULY 25, 2014

4

5

6

7                                    COPY

8

9

10

11

12  ------------------------------------------------

13                  ORAL DEPOSITION OF

14                  BENNIE WASHINGTON

15  ------------------------------------------------

16          ORAL DEPOSITION OF BENNIE WASHINGTON,

17  produced as a witness at the instance of the Defendant,

18  and duly sworn, was taken in the above-styled

19  and -numbered cause on the 25th day of July, 2014, from

20  10:01 a.m. to 10:37 a.m., before Natasha Spoerl, a CSR

21  in and for the State of Texas, reported by machine

22  shorthand at the offices of Schulman Mathias, P.L.L.C.,

23  8390 LBJ Freeway, Suite 500, Dallas, Texas, pursuant to

24  the Texas Rules of Civil Procedure and the provisions

25  stated on the record or attached hereto.

```
 1              A P P E A R A N C E S

 2

 3
   MR. DAMON MATHIAS                    FOR THE PLAINTIFF
 4 SCHULMAN MATHIAS
   LBJ Tower
 5 8390 LBJ Freeway
   Suite 500
 6 Dallas, Texas  75243
   Telephone:  214.739.0100
 7 Facsimile:  214.739.0151
   E-mail:  Damon@schulmanmathias.com

 8

 9

10
   MS. LINDA M. STIMMEL                 FOR THE DEFENDANT
11 WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, L.L.P.
   Bank of America Plaza
12 901 Main Street
   Suite 4800
13 Dallas, Texas  75202
   Telephone:  214.698.8000
14 Facsimile:  214.698.1101
   E-Mail:  Linda.stimmel@wilsonelser.com

15
16
17
18
19
20          *         *         *
21
22
23
24
25
```

Deposition of:  Bennie Washington

7/25/2014

3

1                      I N D E X

2

PROCEEDINGS                                    PAGE

3

Appearances.....................................  2

4

BENNIE WASHINGTON

5      Examination by Ms. Stimmel..................  4

6  Signature and Changes..........................  #

7  Reporter's Certificate.........................  #

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 6 of 52   PageID 10
In Re:  Bennie Washington
Deposition of:  Bennie Washington                                    7/25/2014

4

```
 1                   P R O C E E D I N G S
 2              (The witness was sworn by court reporter.)
 3                    BENNIE WASHINGTON,
 4  having been first duly sworn, testified as follows:
 5                    EXAMINATION
 6  BY MS. STIMMEL:
 7      Q.   Hi.  I just want to introduce myself again.  My
 8  name is Linda Stimmel.  I'm an attorney.  I'm here today
 9  representing Concentra and the physicians at Concentra.
10              This is not a lawsuit, and your attorney
11  has been kind enough to allow me to take a short pre --
12  potentially pre-lawsuit deposition.  And I just want to
13  let you and your attorney know there's just not a lot of
14  information in the records.  I can't really tell what
15  you allege has happened.
16              So what I want to do today Ms.  Washington
17  is just try to get some information, because I don't
18  know much, that way we can assess the case.  Do you
19  understand that?
20      A.   Uh-huh.
21      Q.   And you'll need to say yes or no.
22      A.   I understand.
23              MS. STIMMEL:  Okay.  Also I want to say if
24  you agree, Counsel, that by taking this deposition I'm
25  not waiving any of my rights if this goes into lawsuit.
```

```
 1  I still have my time for deposition discovery as well as
 2  you do.  Is that agreeable?
 3              MR. MATHIAS:  Understood.
 4              MS. STIMMEL:  Thank you.
 5      Q.   (BY MS. STIMMEL)  If you'll just state your
 6  full legal name for the record, please.
 7      A.   Bennie Pipkins Washington.
 8      Q.   Can you spell that middle name?
 9      A.   P-I-P-K-I-N-S.
10      Q.   Okay.  Thank you.  Have you ever had a
11  deposition before?
12      A.   Yes.
13      Q.   Okay.  When was that?
14      A.   I don't remember how long it's been but it was
15  like back in the 80s or the 90s.
16      Q.   A long time ago?
17      A.   Yeah.
18      Q.   And what was the reason for that?  Were you a
19  party to a lawsuit?
20      A.   Car wreck.
21      Q.   Okay.  Any other depositions besides that one?
22      A.   This would be the first one since then.
23      Q.   Okay.  Thank you.  I believe you know Deanna
24  Jones.
25      A.   Yes, I do.
```

In Re:  Bennie Washington
Deposition of:  Bennie Washington                          7/25/2014

6

1      Q.    Are you aware that I took her deposition a

2  couple of weeks ago?

3      A.    No, I'm not.

4      Q.    Okay.  I did the same thing with Ms. Jones to

5  try to learn some information from Ms. Jones.

6            When is the last time you talked to Ms.

7  Jones about the issues that you're concerned with in

8  this doctor's actions in this case?

9      A.    When?

10     Q.    Yes, ma'am.

11     A.    Probably I'd say back in maybe March I guess.

12     Q.    Okay.  Can you tell me what the gist of that

13  conversation was, basically just kind of what y'all

14  talked about?

15     A.    It was when we were in session with the

16  psychiatrist.

17     Q.    Okay.  And I have those records; correct?  You

18  don't know but I do.

19            How many sessions did you go to and

20  actually participate in the same session with Deanna?

21     A.    From my understanding it was four.

22     Q.    All four of them were with her?

23     A.    Yes.

24     Q.    Can you tell me why you all participated

25  together?  I saw that I think Deanna had a session by

7

1 herself.  Why did y'all do joint therapy sessions

2 together?

3     A.    Since we did it together it's because it kind

4 of like happened to us at the same time.  She just

5 separated it -- she talked to us individually but we did

6 have it together.

7     Q.    But you did talk to the therapist together as

8 well?

9     A.    Yes.

10     Q.    Just for the record, because we want this

11 clear, when you're saying because it happened to us

12 together, what do you mean?  What happened to you?

13     A.    The same thing happened to us.

14     Q.    This is the allegations about the doctor?

15     A.    Yes.

16     Q.    Okay.  I just want to get a little bit of short

17 background about you and then I'm going to ask you about

18 the incident.  Okay?

19     A.    All right.

20     Q.    Can you talk to me about your education?  What

21 education have you had?

22     A.    I got a GED.

23     Q.    Okay.

24     A.    And some training.

25     Q.    And when you say training, what kind of

1 training?

2     A.    I took a Word Processing and data entry.

3     Q.    When did you get your GED?

4     A.    I got my GED back in '88, July of '88.  No, it

5 wasn't.  Hold on.  May because my daughter was born in

6 July.

7     Q.    Okay.  What is your date of birth?

8     A.    January 6, 1966.

9     Q.    Okay.  And what is your social security number?

10    A.

11    Q.    What is your current address?

12    A.    242 Highland Village Drive, Mesquite, Texas

13 75149.

14    Q.    Thank you.  Is that a home?  Apartment?  What

15 is that?

16    A.    It's a town home.

17    Q.    And do you live in that town home with anyone

18 else?

19    A.    Yes.

20    Q.    Who is that?

21    A.    My boyfriend.

22    Q.    Okay.  What's his name?

23    A.    Elvis Smith.

24    Q.    Okay.  What does Elvis do for a living?

25    A.    He's an assistant at Plano ISD.

9

```
 1      Q.   Okay.  When you say assistant, do you mean in
 2 one of the schools?  Are you a bus driver?
 3      A.   Yes.
 4      Q.   Does he work in the bus driving section you
 5 mean or --
 6      A.   Yes, he works on the bus with the driver
 7 assisting with the kids.
 8      Q.   And you mentioned your daughter.  How many
 9 children do you have?
10      A.   I have three kids, two girls and a boy.
11      Q.   What are their ages?
12      A.   32, 29, and the other one will be 26.  They're
13 all three years apart.
14      Q.   Could you give me their names, please?
15      A.   Latoya Reese.  Well, she got married.  I think
16 it's Williams.  Alan Pipkins, and then Keena Criss.
17      Q.   Have you been married before?
18      A.   Yes.
19      Q.   How many times?
20      A.   Twice.
21      Q.   Can you tell me the names of your ex-husband's?
22      A.   Alan Pipkins, Sr. and Howard Washington, Jr.
23      Q.   Okay.  Are you still -- you're divorced
24 currently; correct?
25      A.   No.
```

Case 3:15-cv-03698-N-BK   In Re: Bennie Washington   Document 3   Filed 11/17/15   Page 12 of 52   PageID 16
Deposition of:   Bennie Washington                                                    7/25/2014

10

1    Q.    You're still married?

2    A.    I'm a widow.

3    Q.    Okay.  Thank you.  How long have you been a

4  widow?

5    A.    Since it's been I think 10 or 11 years.  I kind

6  of forgot.

7    Q.    I'm just dying to say did you like Elvis's

8  music?

9    A.    Yes, I did.

10   Q.    To have a boyfriend named Elvis you better like

11 Elvis.

12               Let me talk just a little bit about your

13 employment situation.  How long have you been working

14 with Plano ISD?

15   A.    This is fixing to be my fourth year.

16   Q.    Have you been a bus driver the entire time?

17   A.    Yes.

18   Q.    I didn't know if you started in a different

19 position.

20   A.    I did other things but bus driver is my main

21 thing.  That's how I basically make my money.

22   Q.    Okay.  Were you a bus driver for any company or

23 any institution before Plano ISD?

24   A.    Dallas County, Mesquite, Lancaster, Grand

25 Prairie, a private school called Children First.

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 13 of 52   PageID 17
In Re:  Bennie Washington
Deposition of:  Bennie Washington
7/25/2014

11

1            MR. MATHIAS:  Can we go off the record for

2  a second?

3            MS. STIMMEL:  Of course.

4            (There was a short break taken.)

5      Q.   (BY MS. STIMMEL)  Go ahead.  You wanted to

6  clear up a question that I asked you?

7      A.   Yes, about talking to Deanna.  I had talked to

8  her again but I don't remember exactly the date about

9  this because I talked to her when I got rid of the

10 lawyer and hired him.

11     Q.   Okay.

12     A.   So I don't remember what date that was.

13     Q.   Is it okay if I ask why you got rid of the

14 lawyer?

15            MR. MATHIAS:  I would rather her not.

16     Q.   (BY MS. STIMMEL)  I'm not allowed and I don't

17 want to know anything you talked about with your lawyer

18 or your first lawyer so that was kind of a gray

19 territory.  But my understanding is you were originally

20 represented in this matter by Brian Arnold; is that

21 correct?

22     A.   That's correct.

23     Q.   And you changed attorneys approximately --

24 we're sitting here today on July 25th, 2014.  I think

25 you changed attorneys less than a month ago; is that

 1  correct?

 2              MR. MATHIAS:  I think it was May.

 3      Q.   (BY MS. STIMMEL)  So two months ago?

 4      A.   Yeah it's been around that -- maybe about two.

 5  No more than three.  I'm thinking it's been like two.

 6      Q.   Just to make clear from you, I didn't know when

 7  you did.  I just got a letter from Mr. Arnold saying he

 8  no longer represented you when I was asking for

 9  depositions.  So I knew that was --

10      A.   I think it was in April or May when I let him

11  go.

12      Q.   Okay.  Thank you.  Okay.  So we talked about

13  your education.  You were telling me that you've been a

14  bus driver for many years it appears to be; correct?

15      A.   Yes.

16      Q.   And that is your main source of income;

17  correct?

18      A.   Yes.

19      Q.   You said you had done other things.  What are

20  some of the other things you've done to generate income?

21      A.   Home healthcare, working at department stores,

22  whatever.  Most of the time it was in between me driving

23  the school bus.  The school bus was always my main job.

24      Q.   Okay.  And, of course, you have the summers off

25  on that; correct?

1    A.    Not on all of them, but I still work the summer

2 though.

3    Q.    Okay.  And these other companies that you

4 worked for where you drove a school bus, did you always

5 have to have this DOT examination every year?

6    A.    Yes.

7    Q.    When was the first time you went to this

8 Concentra Plano clinic for your DOT exam?

9    A.    I'm not sure the exact date but it had to be

10 in -- sometime in 2012.  I'm going to say probably once

11 school was getting ready to be out or when it came back

12 because I was somewhere else when I was hired.  I think

13 I went to CareNow.  It wasn't them though at the time.

14    Q.    And Ms. Washington, you said you were hired

15 December 5th of what year?

16    A.    December 5th of 2011.

17    Q.    So the first year you went to another clinic

18 for your DOT.  So do you think you have been to the

19 Concentra clinic for DOT exams three times including

20 this one or is --

21    A.    I don't remember the exact times because

22 whenever we have to -- random or whatever, we've got to

23 go so I didn't keep up with all of that.  I got my

24 paperwork and everything.  I just don't remember because

25 we never know when we're going to have to go.

14

1    Q.    Okay.   First of all tell me -- describe the

2 physician that you're talking about you allege that was

3 inappropriate.   Talk to me about -- is it a man or a

4 woman who was inappropriate?

5    A.    It was a female.

6    Q.    And is she African American?

7    A.    Yes.

8    Q.    Okay.   Had you ever seen this doctor before,

9 this time that you're talking about?

10    A.    No.

11    Q.    Okay.   Let's just go ahead and talk about this

12 so I can learn a little bit more.   It appears from me

13 reviewing the records Ms. Washington that you saw her --

14 you went to the clinic two times about this particular

15 DOT exam.

16    A.    Yes, I did.

17    Q.    Okay.   And tell me about the first time.   Did

18 you go to that appointment by yourself?

19    A.    Yes.

20    Q.    Okay.   And tell me how that went that very

21 first time to try to get this new DOT?

22    A.    The first time had to do with my blood

23 pressure.   I hadn't took my medicine for two days and so

24 my blood pressure was kind of elevated.   So he couldn't

25 get it down so he gave me a letter to go see my regular

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 17 of 52   PageID 21
In Re: Bennie Washington
Deposition of: Bennie Washington
7/25/2014

15

1  doctor or to come back the next day once my medicine --

2  like, I took the medicine like 30 minutes before I went

3  in.  It wasn't enough time.

4      Q.   And when you say he, is this a doctor you're

5  talking about?

6      A.   Yes, it was a man that I seen the day before

7  because it was like two days in a row.

8      Q.   So it's my understanding that, I think how it

9  goes is the exam, once they find a particular problem,

10  they don't finish the exam because they need you to fix

11  whatever the issue is; correct?

12      A.   It was blood pressure, yes.

13      Q.   And you were requested because of some high

14  blood pressure to bring back a note from your physician

15  basically stating that you had it under control; is that

16  right?

17      A.   I came back the next day because I took the

18  medicine.

19      Q.   Okay.  Did you ever go to see another physician

20  and bring back a doctor's note?

21      A.   No.

22      Q.   So you gave just it more time for your medicine

23  to kick in?

24      A.   Yes.

25      Q.   Now the next day when you went back, were you

1  with anybody else at that appointment?

2      A.   No.

3      Q.   Can you just walk me through what happened as

4  you go to that appointment?

5      A.   When I went in -- when they gave me her, we

6  went in the room.  When she came in, she told me to pull

7  down my underwear.

8      Q.   That's the first thing she said?

9      A.   Yes.

10     Q.   We're talking about -- do you know her name?

11     A.   I guess it's something like Naomi something or

12  whatever and I think it starts with an O.

13     Q.   If it's the doctor I'm thinking about it's

14  Ocho.  Does that make sense?  It's O-C-H --

15     A.   I don't know.  The writing is bad.  So I really

16  don't know what her name was, but I know she's African

17  American.

18     Q.   Okay.  So an African American female doctor

19  came into the room to do this exam the second day you

20  came back, and the first thing she said to you was what

21  exactly, ma'am?

22     A.   Pull down my underwear.

23     Q.   Is that what you said?  I'd like to get

24  exactly.  Is that what she said?

25     A.   She said pull down my underwear.

1   Q.   Pull down your underwear?

2   A.   Yes.

3   Q.   Okay.  And then what's the next thing that

4 happened?

5   A.   I asked her is this something new.  She said

6 she was checking for hernias and lymph nodes.

7   Q.   Okay.

8   A.   And I was just kind of like this don't seem

9 right.

10   Q.   And you said you were kind of like it doesn't

11 seem right to you.  You were thinking that?

12   A.   Yes, because I never went through that before.

13 I know what a DOT was supposed to be like.

14   Q.   Okay.  When you say I know what one's supposed

15 to be like, it's because --

16   A.   I was saying that in my mind.

17   Q.   And in your mind were you basing that on that

18 you've had several of these exams beforehand?

19   A.   For like 20 years probably.

20   Q.   Okay.  And are you saying today that in all of

21 the exams no one had ever checked for a hernia?

22   A.   And lymph nodes, no.

23   Q.   I want to get this right because I phrased it

24 wrong.  You're testifying today under oath that no one

25 had ever examined you for a hernia in any prior DOT

18

1  exam; is that correct?

2      A.   That's correct.

3      Q.   Okay.  And this was the first time this had

4  happened to you; correct?

5      A.   Yes.

6      Q.   Okay.  So let's go back.  So this lady walked

7  -- a female physician walks in.  The first thing she

8  says is pull down your underwear and then you said is

9  this something new, and then she said I am checking for

10 hernias and lymph nodes?

11     A.   She said yes first before she said she was

12 checking for that.

13     Q.   Okay.  She said yes it is basically; right?  I

14 am checking for hernias and lymph nodes.  Is there

15 anything else that you said to her?  What's the next

16 thing that happened?

17     A.   I let her go ahead and finish, but the whole

18 time when she was doing it I was just -- I didn't feel

19 right.  I was uncomfortable the whole time basically.

20     Q.   Okay.  Since we don't have a camera here I'd

21 like you to describe so we can get it down exactly how

22 she performed that exam.  What she did, how she touched

23 you, what happened when she was doing the exam for the

24 hernia and lymph nodes.  Can you tell us how that went?

25     A.   She did most of the things that they were

19

1 supposed to do.  It was just that part when she said

2 pull down your underwear.  And when I asked her was it

3 new -- but that wasn't the only thing.

4               (The witness stands.)

5          THE WITNESS:  She told me pull down my

6 underwear.  She was standing over to the side of me.  I

7 pulled my underwear down to where our panty line is.

8 She said that wasn't down far enough.  She said pull

9 them down more.  So I pulled them down more, and I was

10 like okay.  That's what made me really, really feel

11 uncomfortable.

12     Q.   (BY MS. STIMMEL)  Okay.  And so we're clear,

13 you were nice enough to stand up.  I appreciate you

14 doing that to try to show me.  You stood up and said

15 that you pulled your underwear to probably like the

16 bottom of your tummy.

17     A.   Where our hair line starts, but I don't have

18 any hair down there.  So I pulled it down there and she

19 turned around and she was like that's not far enough.

20 So right here on my stomach -- and I'm not that big.

21 Okay.  My stomach is a little pudgy but not right now.

22               But she put her hand at the bottom part of

23 my stomach.  I don't know if it was her right hand or

24 left hand, but she put it down here and she kind of like

25 tilted and bent over.

Case 3:15-cv-03698-N-BK In Re: Bennie Washington Document 3 Filed 11/17/15 Page 22 of 52 PageID 26
Deposition of: Bennie Washington 7/25/2014

20

1    Q.   And did she tilt you and bend you over Ms.
2 Washington or did she tilt and bend over?

3    A.   She tilted and bent over to get a good look.  I
4 was standing up straight.

5    Q.   Okay.  And was your -- you're saying your whole
6 vaginal area was exposed at that time?

7    A.   You could see the split.

8    Q.   Okay.  What you showed us standing up, ma'am,
9 was that you had your fingertips.  You said her hand was
10 -- and you showed like maybe three or four of her
11 fingertips were touching down on your groan area; is
12 that correct?

13    A.   Might as well say, yeah.

14    Q.   I don't want to put words in your mouth.  I'm
15 just trying to put it on this deposition so we can
16 explain it.  You tell me if there's a better way to
17 explain it.

18    A.   Well it's the bottom part of my stomach but
19 it's still going towards my privacy.  She wasn't even
20 supposed to touch me and look like that anyway.  Why was
21 she bent over?  It really, really bothered me more
22 because she was a female instead of a male.

23    Q.   And why is that?

24    A.   She's not a man.

25    Q.   Yeah.

1    A.    Even though a man ain't touched me like that

2 either but I'm just -- I felt uncomfortable.

3    Q.    Okay.  All right.  Just so I'm clear, you stood

4 and very kindly kind of showed us how far you pulled

5 your panties down and that she touched with fingertips

6 the area of your groan.  I just want to make sure you're

7 not saying she put her fingers anywhere in your vagina

8 or on your vagina; is that correct?

9    A.    No.

10    Q.    Is that correct?

11    A.    No, she did not put them in my vagina.

12    Q.    Will you just make that statement again for the

13 record?

14    A.    No, she did not put it in my vagina.

15    Q.    Just so it's clear, you're not saying this

16 doctor -- strike that.  This female African American

17 doctor did not take her fingers and touch your vagina

18 anywhere; is that correct?

19    A.    That is correct.

20    Q.    And this female African American doctor did not

21 put her fingers inside your vagina; is that correct?

22    A.    She did not.

23    Q.    Okay.  Her fingers were above your vagina kind

24 of where our leg -- top of our leg, the groan area?

25    A.    Close.

 1    Q.   Okay.  And what bothered you in a way too was

 2  that she bent down and leaned over.  It appeared to be

 3  that she wanted to see what she was examining; correct?

 4    A.   I can't tell you what she was looking for

 5  because I've never been did like that before.

 6    Q.   When she looked at your area and touched you

 7  with her fingers, did she say anything that you felt was

 8  inappropriate?  Any words that was sexual in any way?

 9    A.   No, not that I can remember.

10    Q.   Okay.  Because this is important.  If she said

11  anything at all sexual I need to know.

12    A.   Not that I can remember.

13    Q.   Okay.

14    A.   I had zoned everything out then because I was

15  just worried about pulling my underwear down.

16    Q.   Okay.  And you testified, and I understand the

17  main thing that bothered you you're saying -- is the

18  main thing that bothered you the fact that it was a

19  female touching you?

20    A.   It's just not that.  She's not my primary

21  physician or she's not my gynecologist.  You would

22  expect that from one of them.  She's not.  And I know

23  the guidelines from DOT and that's not it.  I never had

24  to pull my clothes up or down for nobody.

25    Q.   Okay.  Do you know -- have you ever been

1   examined for a hernia before?

2      A.   No.

3      Q.   Do you know what a hernia is generally just as

4   a layperson not a medical person.  Do you know what a

5   hernia is?

6      A.   No, I don't.

7      Q.   Okay.  So when you say you know the DOT

8   guidelines, what do you mean?

9      A.   They're only supposed to do like vital signs,

10  check the ears, stuff like that, simple stuff and you're

11  out of there.  It was not pull your underwear down or

12  let me check your breasts or none of those procedures.

13     Q.   Did this lady ask to check your breasts?

14     A.   No.

15     Q.   Okay.  So the focus of your concern and you

16  seeing a lawyer is that what you just described to us

17  the fact that the female asked you to pull your panties

18  down and pull them further and that she touched you in

19  the groan area that we were discussing; is that right?

20     A.   That's correct.

21     Q.   And there's no comments that she made that you

22  thought were inappropriate; correct?

23     A.   Not that I can remember.

24     Q.   Okay.  And did you say anything to her after

25  the exam was performed?

24

1     A.    No, I just felt uncomfortable.

2     Q.    Okay.  After she examined that area for the

3 hernia, did you pull your panties back up?

4     A.    Yes, I did.

5     Q.    Okay.  And what further happened in that exam?

6     A.    That I remember she just finished the exam the

7 regular way and I left.  I still wasn't feeling good

8 about it.

9     Q.    So what happened when you left then?  Did you

10 call -- go to work and complain?  Did you call back to

11 Concentra?  Tell me what you did.

12     A.    I talked to my boyfriend about it when I got to

13 the car what just happened because I expect doing

14 something like that to be a test that you would do for a

15 man.  And I told him I felt really uncomfortable.

16            He said if you feel uncomfortable about it

17 then talk to somebody about it.  So I ended up calling

18 my area director that next morning and asked did the DOT

19 change, and he said not that he knew of.  So I waited

20 until that Monday and I called and talked to someone.  I

21 don't know who was the person that answered the phone,

22 but I ended up getting somebody named Kerrie something

23 from Concentra clinic.

24            And I told her when I get through talking

25 to you I'm going to call DOT.  She told me when I

1 explained it to her that that was -- I want to say it

2 exactly how she said it.  I told her what happened.  She

3 said that I was violated and that's a violation of DOT.

4 That's exactly how she said it.

5     Q.    It is very important that I find out the name

6 of this lady.  So you say you have it written down

7 somewhere?

8     A.    It's in there.  But on there I also told her

9 that I wasn't the only person it had happened to, that

10 Deanna was going to call.  She never would answer the

11 phone for her.  She called like four times I think.

12 Kerrie Robinson:  (972) 364-8108.

13     Q.    Kerrie Robertson?

14     A.    Yes, Robinson.

15     Q.    I'm sorry, Kerrie Robinson.  Did she tell you

16 how to spell her first time?

17     A.    I think it's K-E-R-R-I-E.

18     Q.    Okay.  This conversation is important to me

19 because I represent Concentra and so I need to know and

20 be able to investigate this.  Tell me exactly again.

21 You called her.  And tell me what you told her and what

22 she said to you again if you don't mind.

23     A.    I pretty much told her everything I told you,

24 how it happened, what happened.  I told the person that

25 was on the phone that answered first, and she was the

 1 one who answered so I knew she had to be somebody that

 2 was high in the company or a supervisor or somebody like

 3 that.

 4    Q.   We're talking about Kerrie?

 5    A.   Yes.  And when she got on the phone, I

 6 explained the whole thing to her, what had happened.

 7 The lady told me to pull my underwear down.  I said I'm

 8 calling you to see -- when I get through talking to you

 9 I'm going to call DOT.  I said I'm calling you to see if

10 the DOT changed or not.  I said because this lady did

11 something to me that I felt like was inappropriate.  I

12 went on and explained it to her, the same thing.

13    Q.   And she said to you what?

14    A.   That she violated me, and that's a violation of

15 DOT.  She said violated my rights and that's a violation

16 of DOT.

17    Q.   Okay.  Anything else that you said on that

18 phone call to Kerrie?  I think you said you told her

19 Deanna was going to call her.

20    A.   I did.

21    Q.   Okay.  Anything else that you remember from

22 that call?

23    A.   No, basically that was it.  Besides I told her

24 that I was going to sue Concentra clinic because I

25 already knew it was wrong.

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 29 of 52   PageID 33
Deposition of:   Bennie Washington
In Re Bennie Washington
7/25/2014

27

 1      Q.   Okay.  Did you ever talk to anybody at

 2  Concentra again after this call with Kerrie?

 3      A.   No.

 4      Q.   Okay.  And how did you know Deanna was going to

 5  call her?  When did you first talk to Deanna about what

 6  happened to you at the clinic?

 7      A.   I don't know how many days.  I had to just

 8  start asking people.

 9      Q.   What do you mean?  Asking them what?

10      A.   Have anything like that happened to them?

11      Q.   And you asked that of Deanna?

12      A.   Yes.

13      Q.   And she said yes?

14      A.   I knew she had went to the doctor like a month

15  or a couple of weeks before me.  So that's why I asked,

16  and that's how I found out it happened to her more than

17  one time.

18      Q.   Okay.  Tell me what you found out from Deanna

19  when you say more than one time.  Tell me what she told

20  you.

21      A.   That it happened to her twice.

22      Q.   By the same doctor?

23      A.   Yes.

24      Q.   Okay.  Do you know when the other incident was?

25      A.   All I know, since it was like two years apart,

1  I think it happened like in 2011 and 2013.

2      Q.    Okay.  Are you and Deanna friends who socialize

3  outside of work?

4      A.    Somewhat but not all the time.

5      Q.    Okay.  So she's a casual friend?

6      A.    Yes.

7      Q.    Okay.  And you said you talked to your area

8  director at Plano ISD.  Who is that?

9      A.    Andrew Foster.

10     Q.    Okay.  Did you call the DOT then after you

11  talked to Kerrie?

12     A.    No, I did not.

13     Q.    Did you call any other person or company about

14  this after speaking to Kerrie?

15     A.    Just her.

16     Q.    Okay.  Now, I know you went to see a therapist;

17  correct?

18     A.    Yes, I did.

19     Q.    Okay.  And I have her records.  Is it Elena

20  Frolov?

21     A.    I call her Elena.

22     Q.    How did you come to find her?

23     A.    I had her once before --

24              THE WITNESS:  Do I have to answer?

25     Q.    (BY MS. STIMMEL)  I'll get to see all of your

29

1  medical records, all of your psych records and therapy

2  records.

3      A.    I seen her when I was out for my shoulder being

4  hurt.  I think the year before last.  I think I came

5  back last May.

6      Q.    And why did you see her about a shoulder

7  injury?

8      A.    They want us to see somebody and make sure that

9  we're okay before we go back to work because being all

10  stressed out and being off and money not really fitting

11  the bills and all of that.

12      Q.    How many times did you see her for that

13  prior --

14      A.    I can't tell you.  You've got to get that

15  information from her.  I don't know.

16      Q.    Are you saying Ms. Washington that the first

17  time you saw Elena Frolov was by a referral from Plano

18  ISD?

19      A.    No.

20      Q.    I thought you said they want us to see somebody

21  so I thought they referred you.

22      A.    No.  I was talking about the job before you

23  come back when you're going through physical therapy

24  because my shoulder was messed up.

25      Q.    So did anybody recommend her to you?

30

```
 1     A.    Doctor -- what is his name?  Dr. Adair.

 2     Q.    Can you spell that for me?

 3     A.    I think it's A-D-A-I-R.

 4     Q.    Okay.  What kind of doctor is Dr. Adair?

 5     A.    He's a physical therapist for like a

 6 chiropractor or something like that.

 7     Q.    All right.  So you went to see Ms. Frolov

 8 because you knew her.  This is somebody you decided to

 9 see; correct?

10     A.    Yes.

11     Q.    And why did you decide to see her?

12     A.    Well I probably would have been comfortable

13 talking to her about something like that and plus she's

14 a female.

15     Q.    Did you recommend her to Deanna Jones?

16     A.    Yes.

17     Q.    Okay.  And tell me what happened during the

18 sessions.  I mean, what kind of therapy did you receive

19 and things like that?

20     A.    As far as about my shoulder?

21     Q.    No, ma'am.  When you went to see Ms. Frolov

22 about this incident?

23     A.    Oh, okay.  We just talked about what happened

24 to us during this process or whatever, and she was

25 making sure that we were okay and I guess what stage of
```

1  mind we were in or whatever because it kind of really

2  jacked us up.

3      Q.    When you say jack you up, I know what that

4  means but tell me some -- if you're sitting here today

5  and say Linda, this is what I experienced after the

6  session with this doctor on the hernia exam.  These are

7  the things I experienced whether it's a nightmare or

8  whatever.  Can you tell me what you experienced that you

9  think was caused by this session with the doctor?

10      A.    Just really feeling uncomfortable, at ease.

11  You kind of feel like you did something wrong when you

12  didn't and that's one of the things that she kept

13  reminding us.  It's nothing that we did.

14      Q.    Okay.  Were you concerned that maybe you gave

15  out some signals that you were maybe a lesbian?

16      A.    I doubt that.

17      Q.    That wasn't one of your concerns.  When you

18  said that I wasn't sure what you meant.

19      A.    No.  When you see the way I am, there's nothing

20  gay about me so that would never come from me.

21      Q.    And I agree.  You're dressed very lovely today

22  and so that's what I just didn't understand.  When you

23  said I wanted to see if I had done something wrong, I

24  don't know what you mean by that.

25      A.    I can't explain it.  It would just have to

1  happen to you for you to feel the way I felt.  So I

2  can't really explain that.  It just messes your head up.

3      Q.   Okay.  Did Ms. Frolov help you?

4      A.   Yes.

5      Q.   Did she give you medication or was the help

6  through being able to talk to her about it?

7      A.   Just talk to her.

8      Q.   Did she help you?  I mean, did you feel like

9  that therapy was a success?

10     A.   Yes.

11     Q.   As you sit here today, do you have any other

12 appointments to see a therapist of any kind about this

13 incident?

14     A.   No.

15     Q.   As you sit here today, do you feel like you're

16 better and you've been able to deal with those feelings

17 that made you uncomfortable?

18     A.   I think about it every once in a while.  It

19 might cross me.  It's something that's not going to ever

20 go away.

21     Q.   You think it's better but it's not going to go

22 away?

23     A.   Yes.

24     Q.   Have you done any other thing like see any

25 other therapist or had to see any other doctor that you

Case 3:15-cv-03698-N-BK   Document 3   Filed 11/17/15   Page 35 of 52   PageID 39
In Re: Bennie Washington
Deposition of:  Bennie Washington                                    7/25/2014

                                                                          33

 1  relate to this incident with the hernia exam?

 2     A.   No, she was the only one.

 3     Q.   All right.  I think that's all the questions I

 4  have for now.  I just needed to learn more information,

 5  and I appreciate you talking to me and giving me more

 6  information so we can assess the matter.

 7     A.   Thank you.

 8     Q.   Thank you so much.

 9              MS. STIMMEL:  I'll pass the witness.

10              MR. MATHIAS:  We'll reserve for trial if

11  need be.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

1  STATE OF TEXAS        )

2  COUNTY OF DALLAS      )

3

4           This is to certify that I, Natasha Spoerl,

5  a Certified Shorthand Reporter duly commissioned and

6  qualified in and for the State of Texas, reported

7  stenographically by machine shorthand the proceedings

8  had at the time and place set forth, and that the above

9  and foregoing pages are a true and accurate transcript

10 of the deposition of Bennie Washington.

11           CERTIFIED TO BY ME on this the

12 7th day of August 2014.

13

14

15

16  *Natasha Spoerl*
    _____
     NATASHA SPOERL,  CSR

17   Texas CSR 8410

     Expiration Date:  12/31/14

18   US Legal Support, Inc.

     CRCB Registration No. 343

19   100 Premier Place

     5910 North Central Expressway

20   Dallas, Texas  75206-5190

     (214) 741-6001

21

22

23

24

25

In Re: Bennie Washington
Case 3:15-cv-03698-N-BK Document 3 Filed 11/17/15 Page 37 of 52 PageID 41
Deposition of: Bennie Washington
7/25/2014

1

## A

**A-D-A-I-R** 30:3
**a.m** 1:20,20
**able** 25:20 32:6,16
**above-styled** 1:18
**accurate** 34:9
**actions** 6:8
**Adair** 30:1,4
**address** 8:11
**African** 14:6 16:16,18 21:16,20
**ages** 9:11
**ago** 5:16 6:2 11:25 12:3
**agree** 4:24 31:21
**agreeable** 5:2
**ahead** 11:5 14:11 18:17
**ain't** 21:1
**Alan** 9:16,22
**allegations** 7:14
**allege** 4:15 14:2
**allow** 4:11
**allowed** 11:16
**America** 2:11
**American** 14:6 16:17,18 21:16,20
**Andrew** 28:9
**answer** 25:10 28:24
**answered** 24:21 25:25 26:1
**anybody** 16:1 27:1 29:25
**anyway** 20:20
**apart** 9:13 27:25
**Apartment** 8:14
**Appearances** 3:3
**appeared** 22:2
**appears** 12:14 14:12
**appointment** 14:18 16:1,4
**appointments** 32:12
**appreciate** 19:13 33:5
**approximately** 11:23
**April** 12:10
**area** 20:6,11 21:6,24 22:6 23:19 24:2,18 28:7
**Arnold** 11:20 12:7
**asked** 11:6 17:5 19:2 23:17 24:18 27:11,15
**asking** 12:8 27:8,9
**assess** 4:18 33:6
**assistant** 8:25 9:1
**assisting** 9:7

**attached** 1:25
**attorney** 4:8,10,13
**attorneys** 11:23,25
**August** 34:12
**aware** 6:1

## B

**back** 5:15 6:11 8:4 13:11 15:1,14,17,20,25
  16:20 18:6 24:3,10 29:5,9,23
**background** 7:17
**bad** 16:15
**Bank** 2:11
**basically** 6:13 10:21 15:15 18:13,19 26:23
**basing** 17:17
**believe** 5:23
**bend** 20:1,2
**Bennie** 1:1,14,16 3:4 4:3 4:3 5:7 34:10
**bent** 19:25 20:3,21 22:2
**better** 10:10 20:16 32:16,21
**big** 19:20
**bills** 29:11
**birth** 8:7
**bit** 7:16 10:12 14:12
**blood** 14:22,24 15:12,14
**born** 8:5
**bothered** 20:21 22:1,17,18
**bottom** 19:16,22 20:18
**boy** 9:10
**boyfriend** 8:21 10:10 24:12
**break** 11:4
**breasts** 23:12,13
**Brian** 11:20
**bring** 15:14,20
**bus** 9:2,4,6 10:16,20,22 12:14,23,23 13:4

## C

**C** 2:1 4:1
**call** 24:10,10,25 25:10 26:9,18,19,22 27:2,5
  28:10,13,21
**called** 10:25 24:20 25:11,21
**calling** 24:17 26:8,9
**camera** 18:20
**car** 5:20 24:13
**CareNow** 13:13
**case** 4:18 6:8

casual 28:5
cause 1:19
caused 31:9
Central 34:19
Certificate 3:7
Certified 34:5,11
certify 34:4
change 24:19
changed 11:23,25 26:10
Changes 3:6
check 23:10,12,13
checked 17:21
checking 17:6 18:9,12,14
children 9:9 10:25
chiropractor 30:6
Civil 1:24
clear 7:11 11:6 12:6 19:12 21:3,15
clinic 13:8,17,19 14:14 24:23 26:24 27:6
Close 21:25
clothes 22:24
come 15:1 28:22 29:23 31:20
comfortable 30:12
comments 23:21
commissioned 34:5
companies 13:3
company 10:22 26:2 28:13
complain 24:10
Concentra 4:9,9 13:8,19 24:11,23 25:19
    26:24 27:2
concern 23:15
concerned 6:7 31:14
concerns 31:17
control 15:15
conversation 6:13 25:18
correct 6:17 9:24 11:21,22 12:1,14,17,25
    15:11 18:1,2,4 20:12 21:8,10,18,19,21 22:3
    23:20,22 28:17 30:9
Counsel 4:24
County 10:24 34:2
couple 6:2 27:15
course 11:3 12:24
court 4:2
CRCB 34:18
Criss 9:16
cross 32:19

CSR 1:20 34:16,17
current 8:11
currently 9:24

---
### D
---

D 3:1 4:1
Dallas 1:23 2:6,13 10:24 34:2,20
DAMON 2:3
Damon@schulmanmathias.com 2:7
data 8:2
date 1:3 8:7 11:8,12 13:9 34:17
daughter 8:5 9:8
day 1:19 15:1,6,17,25 16:19 34:12
days 14:23 15:7 27:7
deal 32:16
Deanna 5:23 6:20,25 11:7 25:10 26:19 27:4,5
    27:11,18 28:2 30:15
December 13:15,16
decide 30:11
decided 30:8
Defendant 1:17 2:10
department 12:21
deposition 1:13,16 4:12,24 5:1,11 6:1 20:15
    34:10
depositions 5:21 12:9
describe 14:1 18:21
described 23:16
DICKER 2:11
different 10:18
director 24:18 28:8
discovery 5:1
discussing 23:19
divorced 9:23
doctor 7:14 14:8 15:1,4 16:13,18 21:16,17,20
    27:14,22 30:1,4 31:6,9 32:25
doctor's 6:8 15:20
doing 18:18,23 19:14 24:13
DOT 13:5,8,18,19 14:15,21 17:13,25 22:23
    23:7 24:18,25 25:3 26:9,10,15,16 28:10
doubt 31:16
Dr 30:1,4
dressed 31:21
Drive 8:12
driver 9:2,6 10:16,20,22 12:14
driving 9:4 12:22

Deposition of:  Bennie Washington

7/25/2014

3

drove 13:4
duly 1:18 4:4 34:5
dying 10:7

## E

E 2:1,1 3:1 4:1,1
E-mail 2:7,14
ears 23:10
ease 31:10
EDELMAN 2:11
education 7:20,21 12:13
either 21:2
Elena 28:19,21 29:17
elevated 14:24
ELSER 2:11
Elvis 8:23,24 10:10,11
Elvis's 10:7
employment 10:13
ended 24:17,22
entire 10:16
entry 8:2
ex-husband's 9:21
exact 13:9,21
exactly 11:8 16:21,24 18:21 25:2,4,20
exam 13:8 14:15 15:9,10 16:19 18:1,22,23
  23:25 24:5,6 31:6 33:1
examination 3:5 4:5 13:5
examined 17:25 23:1 24:2
examining 22:3
exams 13:19 17:18,21
expect 22:22 24:13
experienced 31:5,7,8
Expiration 34:17
explain 20:16,17 31:25 32:2
explained 25:1 26:6,12
exposed 20:6
Expressway 34:19

## F

Facsimile 2:7,14
fact 22:18 23:17
far 19:8,19 21:4 30:20
feel 18:18 19:10 24:16 31:11 32:1,8,15
feeling 24:7 31:10
feelings 32:16

felt 21:2 22:7 24:1,15 26:11 32:1
female 14:5 16:18 18:7 20:22 21:16,20 22:19
  23:17 30:14
find 15:9 25:5 28:22
fingers 21:7,17,21,23 22:7
fingertips 20:9,11 21:5
finish 15:10 18:17
finished 24:6
first 4:4 5:22 10:25 11:18 13:7,17 14:1,17,21
  14:22 16:8,20 18:3,7,11 25:16,25 27:5
  29:16
fitting 29:10
fix 15:10
fixing 10:15
focus 23:15
follows 4:4
foregoing 34:9
forgot 10:6
forth 34:8
Foster 28:9
found 27:16,18
four 6:21,22 20:10 25:11
fourth 10:15
Freeway 1:23 2:5
FRIDAY 1:3
friend 28:5
friends 28:2
Frolov 28:20 29:17 30:7,21 32:3
full 5:6
further 23:18 24:5

## G

G 4:1
gay 31:20
GED 7:22 8:3,4
generally 23:3
generate 12:20
getting 13:11 24:22
girls 9:10
gist 6:12
give 9:14 32:5
giving 33:5
go 6:19 11:1,5 12:11 13:23,25 14:11,18,25
  15:19 16:4 18:6,17 24:10 29:9 32:20,21
goes 4:25 15:9

**going** 7:17 13:10,25 20:19 24:25 25:10 26:9
  26:19,24 27:4 29:23 32:19,21
**good** 20:3 24:7
**Grand** 10:24
**gray** 11:18
**groan** 20:11 21:6,24 23:19
**guess** 6:11 16:11 30:25
**guidelines** 22:23 23:8
**gynecologist** 22:21

## H

**hair** 19:17,18
**hand** 19:22,23,24 20:9
**happen** 32:1
**happened** 4:15 7:4,11,12,13 16:3 17:4 18:4
  18:16,23 24:5,9,13 25:2,9,24,24 26:6 27:6
  27:10,16,21 28:1 30:17,23
**head** 32:2
**healthcare** 12:21
**help** 32:3,5,8
**hereto** 1:25
**hernia** 17:21,25 18:24 23:1,3,5 24:3 31:6 33:1
**hernias** 17:6 18:10,14
**Hi** 4:7
**high** 15:13 26:2
**Highland** 8:12
**hired** 11:10 13:12,14
**Hold** 8:5
**home** 8:14,16,17 12:21
**Howard** 9:22
**hurt** 29:4

## I

**important** 22:10 25:5,18
**inappropriate** 14:3,4 22:8 23:22 26:11
**incident** 7:18 27:24 30:22 32:13 33:1
**including** 13:19
**income** 12:16,20
**individually** 7:5
**information** 4:14,17 6:5 29:15 33:4,6
**injury** 29:7
**inside** 21:21
**instance** 1:17
**institution** 10:23
**introduce** 4:7

**investigate** 25:20
**ISD** 8:25 10:14,23 28:8 29:18
**issue** 15:11
**issues** 6:7

## J

**jack** 31:3
**jacked** 31:2
**January** 8:8
**job** 12:23 29:22
**joint** 7:1
**Jones** 5:24 6:4,5,7 30:15
**Jr** 9:22
**July** 1:3,19 8:4,6 11:24

## K

**K-E-R-R-I-E** 25:17
**Keena** 9:16
**keep** 13:23
**kept** 31:12
**Kerrie** 24:22 25:12,13,15 26:4,18 27:2 28:11
  28:14
**kick** 15:23
**kids** 9:7,10
**kind** 4:11 6:13 7:3,25 10:5 11:18 14:24 17:8
  17:10 19:24 21:4,23 30:4,18 31:1,11 32:12
**kindly** 21:4
**knew** 12:9 24:19 26:1,25 27:14 30:8
**know** 4:13,18 5:23 6:18 10:18 11:17 12:6
  13:25 16:10,15,16 17:13,14 19:23 22:11
  22:22,25 23:3,4,7 24:21 25:19 27:4,7,24,25
  28:16 29:15 31:3,24

## L

**L.L.P** 2:11
**lady** 18:6 23:13 25:6 26:7,10
**Lancaster** 10:24
**Latoya** 9:15
**lawsuit** 4:10,25 5:19
**lawyer** 11:10,14,17,18 23:16
**layperson** 23:4
**LBJ** 1:23 2:4,5
**leaned** 22:2
**learn** 6:5 14:12 33:4
**left** 19:24 24:7,9
**leg** 21:24,24

**legal** 5:6 34:18
**lesbian** 31:15
**let's** 14:11 18:6
**letter** 12:7 14:25
**Linda** 2:10 4:8 31:5
**Linda.stimmel@wilsonelser.com** 2:14
**line** 19:7,17
**little** 7:16 10:12 14:12 19:21
**live** 8:17
**living** 8:24
**long** 5:14,16 10:3,13
**longer** 12:8
**look** 20:3,20
**looked** 22:6
**looking** 22:4
**lot** 4:13
**lovely** 31:21
**lymph** 17:6,22 18:10,14,24

---
## M
**M** 2:10
**ma'am** 6:10 16:21 20:8 30:21
**machine** 1:21 34:7
**main** 2:12 10:20 12:16,23 22:17,18
**making** 30:25
**male** 20:22
**man** 14:3 15:6 20:24 21:1 24:15
**March** 6:11
**married** 9:15,17 10:1
**Mathias** 1:22 2:3,4 5:3 11:1,15 12:2 33:10
**matter** 11:20 33:6
**mean** 7:12 9:1,5 23:8 27:9 30:18 31:24 32:8
**means** 31:4
**meant** 31:18
**medical** 23:4 29:1
**medication** 32:5
**medicine** 14:23 15:1,2,18,22
**mentioned** 9:8
**Mesquite** 8:12 10:24
**messed** 29:24
**messes** 32:2
**middle** 5:8
**mind** 17:16,17 25:22 31:1
**minutes** 15:2
**Monday** 24:20

**money** 10:21 29:10
**month** 11:25 27:14
**months** 12:3
**morning** 24:18
**MOSKOWITZ** 2:11
**mouth** 20:14
**music** 10:8

---
## N
**N** 2:1 3:1 4:1
**name** 4:8 5:6,8 8:22 16:10,16 25:5 30:1
**named** 10:10 24:22
**names** 9:14,21
**Naomi** 16:11
**Natasha** 1:20 34:4,16
**need** 4:21 15:10 22:11 25:19 33:11
**needed** 33:4
**never** 13:25 17:12 22:5,23 25:10 31:20
**new** 14:21 17:5 18:9 19:3
**nice** 19:13
**nightmare** 31:7
**nodes** 17:6,22 18:10,14,24
**North** 34:19
**note** 15:14,20
**number** 8:9
**numbered** 1:19

---
## O
**O** 4:1 16:12
**O-C-H** 16:14
**oath** 17:24
**Ocho** 16:14
**offices** 1:22
**Oh** 30:23
**okay** 4:23 5:10,13,21,23 6:4,12,17 7:16,18,23
   8:7,9,22,24 9:1,23 10:3,22 11:11,13 12:12
   12:12,24 13:3 14:1,8,11,17,20 15:19 16:18
   17:3,7,14,20 18:3,6,13,20 19:10,12,21 20:5
   20:8 21:3,23 22:1,10,13,16,25 23:7,15,24
   24:2,5 25:18 26:17,21 27:1,4,18,24 28:2,5,7
   28:10,16,19 29:9 30:4,17,23,25 31:14 32:3
**once** 13:10 15:1,9 28:23 32:18
**one's** 17:14
**ORAL** 1:13,16
**originally** 11:19

outside 28:3

**P**

P 2:1,1 4:1
P-I-P-K-I-N-S 5:9
P.L.L.C 1:22
PAGE 3:2
pages 34:9
panties 21:5 23:17 24:3
panty 19:7
paperwork 13:24
part 19:1,22 20:18
participate 6:20
participated 6:24
particular 14:14 15:9
party 5:19
pass 33:9
people 27:8
performed 18:22 23:25
person 23:4 24:21 25:9,24 28:13
phone 24:21 25:11,25 26:5,18
phrased 17:23
physical 29:23 30:5
physician 14:2 15:14,19 18:7 22:21
physicians 4:9
Pipkins 5:7 9:16,22
place 34:8,19
PLAINTIFF 2:3
Plano 8:25 10:14,23 13:8 28:8 29:17
Plaza 2:11
please 5:6 9:14
plus 30:13
position 10:19
potentially 4:12
Prairie 10:25
pre 4:11
pre-lawsuit 4:12
Premier 34:19
pressure 14:23,24 15:12,14
pretty 25:23
primary 22:20
prior 17:25 29:13
privacy 20:19
private 10:25
probably 6:11 13:10 17:19 19:15 30:12

problem 15:9
Procedure 1:24
procedures 23:12
proceedings 3:2 34:7
process 30:24
Processing 8:2
produced 1:17
provisions 1:24
psych 29:1
psychiatrist 6:16
pudgy 19:21
pull 16:6,22,25 17:1 18:8 19:2,5,8 22:24
   23:11,17,18 24:3 26:7
pulled 19:7,9,15,18 21:4
pulling 22:15
pursuant 1:23
put 19:22,24 20:14,15 21:7,11,14,21

**Q**

qualified 34:6
question 11:6
questions 33:3

**R**

R 2:1 4:1
random 13:22
ready 13:11
really 4:14 16:15 19:10,10 20:21,21 24:15
   29:10 31:1,10 32:2
reason 5:18
receive 30:18
recommend 29:25 30:15
record 1:25 5:6 7:10 11:1 21:13
records 4:14 6:17 14:13 28:19 29:1,1,2
Reese 9:15
referral 29:17
referred 29:21
Registration 34:18
regular 14:25 24:7
relate 33:1
remember 5:14 11:8,12 13:21,24 22:9,12
   23:23 24:6 26:21
reminding 31:13
reported 1:21 34:6
reporter 4:2 34:5

**Reporter's** 3:7
**represent** 25:19
**represented** 11:20 12:8
**representing** 4:9
**requested** 15:13
**reserve** 33:10
**reviewing** 14:13
**rid** 11:9,13
**right** 7:19 15:16 17:9,11,23 18:13,19 19:20
   19:21,23 21:3 23:19 30:7 33:3
**rights** 4:25 26:15
**Robertson** 25:13
**Robinson** 25:12,14,15
**room** 16:6,19
**row** 15:7
**Rules** 1:24

**S**

**S** 2:1 4:1
**saw** 6:25 14:13 29:17
**saying** 7:11 12:7 17:16,20 20:5 21:7,15 22:17
   29:16
**says** 18:8
**school** 10:25 12:23,23 13:4,11
**schools** 9:2
**Schulman** 1:22 2:4
**second** 11:2 16:19
**section** 9:4
**security** 8:9
**see** 14:25 15:19 20:7 22:3 26:8,9 28:16,25
   29:6,8,12,20 30:7,9,11,21 31:19,23 32:12,24
   32:25
**seeing** 23:16
**seen** 14:8 15:6 29:3
**sense** 16:14
**separated** 7:5
**session** 6:15,20,25 31:6,9
**sessions** 6:19 7:1 30:18
**set** 34:8
**sexual** 22:8,11
**short** 4:11 7:16 11:4
**shorthand** 1:22 34:5,7
**shoulder** 29:3,6,24 30:20
**show** 19:14
**showed** 20:8,10 21:4

**side** 19:6
**signals** 31:15
**Signature** 3:6
**signs** 23:9
**simple** 23:10
**sit** 32:11,15
**sitting** 11:24 31:4
**situation** 10:13
**Smith** 8:23
**social** 8:9
**socialize** 28:2
**somebody** 24:17,22 26:1,2 29:8,20 30:8
**Somewhat** 28:4
**sorry** 25:15
**source** 12:16
**speaking** 28:14
**spell** 5:8 25:16 30:2
**split** 20:7
**Spoerl** 1:20 34:4,16
**Sr** 9:22
**stage** 30:25
**stand** 19:13
**standing** 19:6 20:4,8
**stands** 19:4
**start** 27:8
**started** 10:18
**starts** 16:12 19:17
**state** 1:21 5:5 34:1,6
**stated** 1:25
**statement** 21:12
**stating** 15:15
**stenographically** 34:7
**Stimmel** 2:10 3:5 4:6,8,23 5:4,5 11:3,5,16
   12:3 19:12 28:25 33:9
**stomach** 19:20,21,23 20:18
**stood** 19:14 21:3
**stores** 12:21
**straight** 20:4
**Street** 2:12
**stressed** 29:10
**strike** 21:16
**stuff** 23:10,10
**success** 32:9
**sue** 26:24
**Suite** 1:23 2:5,12

summer 13:1
summers 12:24
supervisor 26:2
Support 34:18
supposed 17:13,14 19:1 20:20 23:9
sure 13:9 21:6 29:8 30:25 31:18
sworn 1:18 4:2,4

**T**

take 4:11 21:17
taken 1:18 11:4
talk 7:7,20 10:12 14:3,11 24:17 27:1,5 32:6,7
talked 6:6,14 7:5 11:7,9,17 12:12 24:12,20
    28:7,11 30:23
talking 11:7 14:2,9 15:5 16:10 24:24 26:4,8
    29:22 30:13 33:5
Telephone 2:6,13
tell 4:14 6:12,24 9:21 14:1,17,20 18:24 20:16
    22:4 24:11 25:15,20,21 27:18,19 29:14
    30:17 31:4,8
telling 12:13
territory 11:19
test 24:14
testified 4:4 22:16
testifying 17:24
Texas 1:21,23,24 2:6,13 8:12 34:1,6,17,20
Thank 5:4,10,23 8:14 10:3 12:12 33:7,8
therapist 7:7 28:16 30:5 32:12,25
therapy 7:1 29:1,23 30:18 32:9
thing 6:4 7:13 10:21 16:8,20 17:3 18:7,16
    19:3 22:17,18 26:6,12 32:24
things 10:20 12:19,20 18:25 30:19 31:7,12
think 6:25 9:15 10:5 11:24 12:2,10 13:12,18
    15:8 16:12 25:11,17 26:18 28:1 29:4,4 30:3
    31:9 32:18,21 33:3
thinking 12:5 16:13 17:11
thought 23:22 29:20,21
three 9:10,13 12:5 13:19 20:10
tilt 20:1,2
tilted 19:25 20:3
time 5:1,16 6:6 7:4 10:16 12:22 13:7,13 14:9
    14:17,21,22 15:3,22 18:3,18,19 20:6 25:16
    27:17,19 28:4 29:17 34:8
times 9:19 13:19,21 14:14 25:11 29:12
today 4:8,16 11:24 17:20,24 31:4,21 32:11,15

told 16:6 19:5 24:15,24,25 25:2,8,21,23,23,24
    26:7,18,23 27:19
top 21:24
touch 20:20 21:17
touched 18:22 21:1,5 22:6 23:18
touching 20:11 22:19
Tower 2:4
town 8:16,17
training 7:24,25 8:1
transcript 34:9
trial 33:10
true 34:9
try 4:17 6:5 14:21 19:14
trying 20:15
tummy 19:16
turned 19:19
twice 9:20 27:21
two 9:10 12:3,4,5 14:14,23 15:7 27:25

**U**

Uh-huh 4:20
uncomfortable 18:19 19:11 21:2 24:1,15,16
    31:10 32:17
understand 4:19,22 22:16 31:22
understanding 6:21 11:19 15:8
Understood 5:3
underwear 16:7,22,25 17:1 18:8 19:2,6,7,15
    22:15 23:11 26:7

**V**

vagina 21:7,8,11,14,17,21,23
vaginal 20:6
Village 8:12
violated 25:3 26:14,15
violation 25:3 26:14,15
vital 23:9

**W**

waited 24:19
waiving 4:25
walk 16:3
walked 18:6
walks 18:7
want 4:7,12,16,23 7:10,16 11:17 17:23 20:14
    21:6 25:1 29:8,20
wanted 11:5 22:3 31:23

**Washington** 1:1,14,16 3:4 4:3,16 5:7 9:22
 13:14 14:13 20:2 29:16 34:10
**wasn't** 8:5 13:13 15:3 19:3,8 20:19 24:7 25:9
 31:17,18
**way** 4:18 20:16 22:1,8 24:7 31:19 32:1
**We'll** 33:10
**we're** 11:24 13:25 16:10 19:12 26:4 29:9
**we've** 13:22
**weeks** 6:2 27:15
**went** 13:7,13,17 14:14,20 15:2,25 16:5,6
 17:12 18:24 26:12 27:14 28:16 30:7,21
**widow** 10:2,4
**Williams** 9:16
**WILSON** 2:11
**witness** 1:17 4:2 19:4,5 28:24 33:9
**woman** 14:4
**Word** 8:2
**words** 20:14 22:8
**work** 9:4 13:1 24:10 28:3 29:9
**worked** 13:4
**working** 10:13 12:21
**works** 9:6
**worried** 22:15
**wreck** 5:20
**writing** 16:15
**written** 25:6
**wrong** 17:24 26:25 31:11,23

---

**X**

**X** 3:1

---

**Y**

**y'all** 6:13 7:1
**yeah** 5:17 12:4 20:13,25
**year** 10:15 13:5,15,17 29:4
**years** 9:13 10:5 12:14 17:19 27:25

---

**Z**

**zoned** 22:14

---

**0**

---

**1**

**10** 10:5
**10:01** 1:20
**10:37** 1:20

**100** 34:19
**11** 10:5
**12/31/14** 34:17
**1966** 8:8

---

**2**

**2** 3:3
**20** 17:19
**2011** 13:16 28:1
**2012** 13:10
**2013** 28:1
**2014** 1:3,19 11:24 34:12
**214** 34:20
**214.698.1101** 2:14
**214.698.8000** 2:13
**214.739.0100** 2:6
**214.739.0151** 2:7
**242** 8:12
**25** 1:3
**25th** 1:19 11:24
**26** 9:12
**29** 9:12

---

**3**

**30** 15:2
**32** 9:12
**343** 34:18
**364-8108** 25:12

---

**4**

**4** 3:5
**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** 8:10
**4800** 2:12

---

**5**

**500** 1:23 2:5
**5910** 34:19
**5th** 13:15,16

---

**6**

**6** 8:8

---

**7**

**741-6001** 34:20
**75149** 8:13
**75202** 2:13

Deposition of: Bennie Washington                                    7/25/2014

10

**75206-5190** 34:20
**75243** 2:6
**7th** 34:12

_____ **8** _____
**80s** 5:15
**8390** 1:23 2:5
**8410** 34:17
**88** 8:4,4

_____ **9** _____
**901** 2:12
**90s** 5:15
**972** 25:12

866-377-8649

200-366-4800

CIN CENTER CLINIC
1-800-818-5521

CORPORATE OFFICE
5050 SPECTRUM Dr #1800 W. Addison TX 75001
(972) 364-8000

1300 N. Central Expy
Ph. (972) 578-8912
FAX (972) 881-7666

(972) 881-1011
D J

Kerry Robinson
(972) 364-8108

## CONTRACT OF EMPLOYMENT

**STATE OF TEXAS**                              )
                                                )   **KNOW ALL MEN BY THESE PRESENTS:**
**COUNTY OF DALLAS**                            )

The undersigned ("Client") hereby constitutes, appoints and employs Brian R. Arnold, Attorney at Law, also doing business as Brian R. Arnold & Associates, Attorneys at Law (hereinafter referred to collectively as "Attorneys"), as attorney at law and in fact, to investigate, prepare and prosecute any claim or lawsuit for damages, personal injuries and/or property damages, suffered by: **BENNIE WASHINGTON**

Said attorneys are hereby authorized to make claim, and if necessary, to bring a lawsuit against: **All wrongful parties**, or any person, firm, or corporation that is legally responsible for the occurrence identified above, and to prosecute said claim by suit through all courts having proper jurisdiction.   This Contract of Employment is assignable or otherwise transferable solely to a duly licensed attorney associated with and approved by the attorneys herein.  The undersigned shall receive notice of such assignment or transfer. Attorneys reserve the right to rescind this contract.

The undersigned also hereby sells, transfers and conveys, and agrees to pay and deliver to said attorneys:

(1)      33-1/3% of whatever amounts may be recovered or collected from any party before filing suit, as a result of damages sustained on the occasion identified above;

(2)      40% of whatever amount may be recovered or collected from any party subsequent to the commencement of an action in a court of competent jurisdiction but before trial;

(3)      45% of whatever amount may be recovered or collected from any party if a settlement is reached or an award rendered after jury selection begins at trial or after opening argument if trial is without a jury;

(4)      If an appeal is taken by either party from the trial court, the above attorney s fee percentage shall increase to 50% and;

(5)      The above percentages shall be applied to the gross amount recovered or collected and shall be computed and paid prior to the payment of any other fees, expenses, or bills, etc.  Recovery or collection includes but is not limited to funds collected from any party or their representatives by compromise and settlement, payments of any claims, funds obtained which relate to employment of this firm pursuant to this contract of employment, liability and/or uninsured/underinsured motorist, personal injury protection, medical payments coverages and any additional insurance policies found in effect.  If any claims are satisfied by a structured settlement (whereby a recovery is paid over a period of time rather than a lump sum), it is agreed that the present value of such settlement based upon its actual cost shall be employed as the basis for the computation of attorney's

**CONTRACT OF EMPLOYMENT - PAGE 1**

fees and, to the extent possible, all attorney's fees shall be paid at the time such settlement is first funded.

In no event shall this cause of action be compromised and settled by said attorneys without the oral or written consent of the undersigned or the legal representative thereof.

Said attorneys are hereby given a lien on the cause of action on all judgments, funds, or property recovered or received by virtue thereof, as security for the payment of attorney's fees set out above and any expenses or money that may be advanced by said attorneys at said attorney's discretion. Said attorneys may employ, at their discretion, medical experts, technical experts, investigators, and associate counsel to assist in the prosecution of the undersigned Clients claim, with such expenses and costs being paid by the Client as further set out herein. It is further agreed that the undersigned will bear all expenses properly incurred in the investigation, preparation and prosecution of this claim or lawsuit, including but not limited to those costs and expenses previously enumerated, court costs, deposition fees, witness expenses, expenses for photographs and exhibits, medical record copies and medical affidavit fees, medical narratives, photocopies, fax charges, courier fees, overnight delivery fees, postage, reasonable personal and travel expenses incurred by attorneys in advancing the undersigned Client's cause and any other expenses, shall be billed to the Client or advanced by Client within fifteen (15) days after request by attorneys. Client agrees to indemnity and hold Attorneys harmless from any liability arising from the aforementioned expenses and agrees that he/she is solely responsible and liable for any such costs, debts or related expenses. If not paid at the time incurred, said costs shall be reimbursed to the attorneys out of the amount collected in the event of settlement or judgment if the attorney so chooses or same may be billed directly to the Client. Said expenses are over and above attorney's fees and shall be computed and paid prior to (with the exception of attorney's fees) the payment of any other fees, expenses, or bills, etc. Said attorneys are vested with full right to collect and pay all attorney's fees, monies, and expenses then owing and incurred by Client and/or on behalf of Client. In the event that said attorneys are compelled to pursue collection remedies, intervene in a pending lawsuit or initiate any subsequent lawsuit in order to recover the fees, costs, and/or expenses for services rendered or incurred and/or advanced and due attorneys, Client additionally agrees to pay the pre-litigation and post litigation fees, costs, and/or expenses accruing in favor of the attorney, attorneys, agency, representatives or firms employed by attorneys to recover the fees, costs, and/or expenses due pursuant to the terms of this contract, including 1.5% interest per month (18% per year) on any unpaid amount/balance. Additionally, Client agrees to pay any and all court costs and expenses connected with the pending lawsuit or any subsequent lawsuit as described above.

The parties expressly understand that if no recovery is obtained on the claim which is the subject of this agreement, attorneys' will make no charges for attorneys time, services or fees unless otherwise agreed. Regardless, of whether there is a recovery or not, Client understands and agrees that he/she is responsible for the payment and/or reimbursement of costs and expenses advanced or incurred on his/her behalf and Attorneys retain the right to pursue the collection of same as set out hereinabove.

Attorneys are hereby appointed agent and attorney, in fact, to execute in the name or and on behalf of the undersigned all necessary releases, drafts, checks, endorsements,

**CONTRACT OF EMPLOYMENT - PAGE 2**

instruments, powers of attorney, authorizations, pleadings/documents filed with the Court, receipts, releases, settlements, discharges, judgments or recoveries of whatever nature requisite to the disposition of this matter.

Attorneys make no predictions or promises as to the outcome of Client's case, and further Client expressly acknowledges that all statements of attorneys on these matters are statements of opinion only. If investigation indicates that Client's case does not have merit or there is no insurance or no liability on the part of defendants, or further pursuit of Client's case is not economically feasible, Attorneys may withdraw from representation and cancel this agreement by sending written notice to Client. Attorneys may also cancel if Client is uncooperative. Client agrees to immediately reimburse Attorneys for any and all expenses incurred or advanced by Attorneys on Client's behalf in the event of withdrawal or cancellation. Attorneys may deduct from proceeds to Client any sums owed Attorneys at the time of final settlement or from funds received on this or any other matter being handled by Attorneys for Client.

Client agrees to keep the Attorneys advised of Client's whereabouts, to cooperate in the preparation of the case and to be present upon reasonable notice. Attorneys agree to keep Client reasonably informed on the progress of the Client's claim. Attorneys reserve the right to withdraw from representation of Client in the event Client fails to keep Attorneys apprized of Client's whereabouts, change in address and/or phone number or otherwise fails to cooperate in any way. In the event of withdrawal, it is expressly agreed between the parties hereto that Attorneys shall not release Client from his/her contractual obligations herein and shall have a lien for Attorneys contractual fees and shall be reimbursed immediately for costs expended. In the event Attorneys contractual fees can not be determined, then Client agrees that Attorneys shall be compensated for the reasonable and necessary time and expenses incurred by attorneys in handling Client's case at the Attorneys' current hourly billable rate.

In the event said Attorneys issue letters or execute lien documents on behalf of the undersigned Client to either delay collection procedures, protect Client's credit or obtain medical treatment in relation to and during the processing of Client's claim by Attorneys, the undersigned Client hereby agrees to indemnity and hold harmless Attorneys from any liability arising from the issuance of said letters and/or documents and agrees that he/she is solely responsible and liable for any such liens, medical bills, debts or related expenses which are covered by said letters and/or documents.

Unless Client requests otherwise, Attorneys may utilize exhibits, documents and materials developed in this case as teaching and demonstration aids in lectures and professional presentations. In this regard Client's name will be kept strictly confidential. After the case is over, Attorneys may destroy Client's file.

The validity of this agreement and of any of its terms or provisions, as well as the rights and duties of the parties hereto, shall be governed by the laws of the State of Texas, U.S.A. and shall be performable in Dallas County, Texas. In the event any action at law or in equity is brought to enforce or interpret the provisions of this agreement Client agrees that Attorneys shall be entitled to reimbursement of reasonable attorney's fees in addition to any other relief which Attorneys may be entitled.

**CONTRACT OF EMPLOYMENT - PAGE 3**

As required by the rules of the State Bar Act, the following notice is required to be provided to all clients of attorney practicing law in the state of Texas:  The State Bar of Texas investigates and prosecutes professional misconduct committed by Texas attorneys. Although not every complaint against or dispute with a lawyer involves professional misconduct, the State Bar Office of General Counsel will provided you with information about how to file a complaint.  For more information, please call 1-800-932-1900.  This is a toll-free phone call.

**READ CAREFULLY:  THIS IS YOUR CONTRACT.  IT PROTECTS BOTH YOU AND YOUR ATTORNEYS AND WILL PREVENT MISUNDERSTANDING IN THE FUTURE.  IF YOU DO NOT UNDERSTAND IT, OR IF IT DOES NOT CONTAIN ALL THE AGREEMENTS, PLEASE DO NOT SIGN THIS CONTRACT.**

I have read the terms and conditions stated herein and fully understand same.


_10-22-13_
Date

Signature:  **BENNIE WASHINGTON**


Accepted:  BRIAN R. ARNOLD & ASSOCIATES


by: _____
Attorney at Law


**CONTRACT OF EMPLOYMENT - PAGE 4**

# NEW CASE SET UP SHEET
# PERSONAL INJURY CASES

**Client name:** Bennie Washington   **Date Opened:** 10/28/13

**Case Type:** PI (MedMal)   **Referral Source:** PPL

1. Please Set up file on ABACUS.

2. Please prepare the following file labels:

   Client last name, first name   PI   DOL: 9-20-13

   A. CORRESPONDENCE

   B. MEDICAL

   C. COSTS

   D. ACCIDENT REPORT

   E. PLEADINGS

   F. DISCOVERY

   G. MOTIONS/HEARINGS

   H. EVIDENCE

   I. WORK

3. Please CALENDAR SOL on ABACUS.   9/20/15